UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

Oct 29   2 31 PM '03

U. S. DISTRICT COURT
NEW HAVEN, CONN.

GRETA FAIRBROTHER,                    :
                    Plaintiff        :
                                     :
                                     :
        v.                           :    3:01-CV-162 (EBB)
                                     :
                                     :
STATE OF CONNECTICUT, DEPARTMENT     :
OF MENTAL HEALTH AND ADDICTION       :
SERVICES,                            :
                    Defendant        :

## RULING ON DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR A NEW TRIAL

### INTRODUCTION

Plaintiff, Greta Fairbrother ("Fairbrother"), filed this action, alleging that she was subject to a sexually hostile work environment under Title VII and, also under that statute, retaliation for the filing of CHRO Complaints against her employer, the State of Connecticut, Department of Mental Health and Addiction Services ("DMHAS"), specifically, Whiting Forensic Institute ("Whiting").

A four-day trial was held from March 12 through March 17, 2003. On March 17, 2003, the jury returned a verdict in favor of Fairbrother. She was awarded $20,000.00 in damages.

DHMAS has filed a timely Motion for Judgment as a Matter of Law or a New Trial, which Motion is now ready for decision.

### STATEMENT OF RELEVANT BACKGROUND FACTS

The Court sets forth only those relevant background facts

believed necessary to a full understanding of this litigation. This overview sets forth the full scenery with *de minimus* trial citation, although every fact herein was a part of the trial. Additional facts, with full citation, are to be found woven within the legal analysis of DMHAS' Motion.

Fairbrother transferred to Whiting from Connecticut Valley Hospital in March, 1996. Whiting is a hospital for the criminally insane, with most patients being transferred there from prison. The patients are dangerous to themselves and to others. As Lead Forensic Treatment Specialist ("FTS") on Unit One, William Boisvert ("Boisvert"), described Whiting: "Usually the patients are highly assaultive, suicidal, very suicidal. We usually get the people that Corrections can't handle. They've decompensated during prison terms or suggested suicide; very dangerous people. We're the last step on the list from the mental health system". Trial Testimony ("TT") of Boisvert, Vol. 2. 62:12-17. For this reason, trust and teamwork is "absolutely" critical. *Id.* 62:20. Each person who testified spoke of this critical need for trust amongst the entire staff on any unit at Whiting, including, in emphatic terms, Fairbrother.

When Fairbrother first transferred to Whiting she was assigned to Unit Five, third shift, as an FTS. There are six units at Whiting, and three different shifts. An FTS is responsible for the care and treatment of the criminally insane and for the maintenance of a safe and healthy environment for both the patients and the staff.

2

Fairbrother transferred to Unit One in the early part of 1999, at which time the nurse supervisors were Angela Kerin ("Kerin") and Al Davis ("Davis"), and her immediate supervisor was Boisvert. Tammi Brown ("Brown") became the staff nurse on Unit One in or about December, 1999.

Fairbrother alleged that, in or about, September, 1999, Boisvert and the majority of the male staff began to treat her with hostility.  Specifically, at a much later date, she identified, along with Boisvert, Jacques Ouimette ("Ouimette"), James Young ("Young"), Chris Colavito ("Colavito"), and Ronald Jursch ("Jursch").  In contrast, she made no complaint as to her "best friend", her "rock", the one "who always took [her] side", FTS David Phelps ("Phelps").[1]/

Her initial allegations of hostility were fairly innocuous and gender neutral. She would ask a question, to which no one would allegedly provide an answer; allegedly, no one gave her her phone messages; sometimes a patient for whom she was directly responsible would ask where she was and "they" would allegedly advise the patient that they did not know where she was; Boisvert allegedly was staring at her, apparently scrutinizing her work.

In November of 1999, Fairbrother went to nurse supervisor Al Davis ("Davis") to request that he hold staff meetings because of what she perceived as hostility on the unit. She told him that "generally, . . . the employees on the unit weren't getting

---

[1]/ Fairbrother failed to call Phelps as a witness in the trial of this matter.

along, and she thought that . . . she could work the problems out
on the unit." Deposition of Allen Davis, March 7, 2003, at
39:8-10 (entered into trial via videotape). She gave no
specifics as to what she perceived. *Id.* 39:11-12. Davis went on

vacation shortly after Fairbrother's request. As he returned,
Fairbrother went on vacation. Accordingly, no staff meetings
were held until late February - early March, 2000. The purpose of
the meetings was to put things out on the table concerning all
that was going on on Unit One, with all staff to be involved in
open and frank discussion. Statement of Tammi Brown, taken June
25, 2001, 12:1-3. A secondary purpose was to determine a way for
the staff to work with Fairbrother. *Id.* There were eight or nine

meetings and the staff and supervisors, including Director of
Human Resources, Pamela Morrison-Wolf ("Morrison"), found that
they were not effective. Although Fairbrother stated that "they
all ganged up" on her at these meetings, the other attendees each
noted that she was not the only staff member whose conduct and
treatment of the patients were discussed. Fairbrother was not
receptive to any critique of her performance, denied all
instances discussed, and refused to take responsibility for any
other actions also discussed. The other staff members commented
that they each felt that Fairbrother was undermining treatment on
the unit, that she was not following patients' treatment plans,
and that, in general, she was not helpful in any way to the
running of the unit. Davis Deposition, 26:5-11.

Boisvert acknowledged that, on a particular evening, he had

4

suggested to Fairbrother that she transfer to another unit. He told her that he thought that she would be better off on another unit.  The reason he said this to her was due to a particular incidence of her escalating a patient twice within a very short period of time. [2]/ Boisvert TT Excerpts, Exhibit Four to Pending Memorandum of Law; 19:10-17.  At trial, FTS Jacques Ouimette described the two incidents: on a cold winter evening, certain patients were to be escorted to a group session. The patients were lined up, with their winter coats on.  The door was opened and the patients were leaving.  The last person in line recalled that he needed his coat and pass.  He asked Fairbrother if he could run to get them, which request was granted.  The patient then ran down the hall, grabbed his coat, and ran back. Before he could get back, Fairbrother had closed and locked the door and merely stated "too late."  The patient became very agitated and Ouimette had to de-escalate him.  The patient returned to his room.  Shortly after, he came out of the room, calmed down, and requested to make a telephone call.  He asked Fairbrother to put him on the telephone, which request was again granted. The patient could not recall the number off the top of his head, so he bent over and took a paper out of his sweatpants. As he stood up to give Fairbrother the number, she said, again, "too late. That's it."  The patient then became so agitated that Ouimette had to call other staff members to aid him in the patient's de-

_____

[2]/ To escalate a patient means "getting them into an agitated state." Boisvert, Vol. 2, at 65:20.

5

escalation. TT, Ouimette, Vol 2, 99:17-25; 100:3-16; 100:20-25; 101:1-13.

Many of the FTS' testified at trial to a multitude of other acts of Fairbrother's escalation of patients.[3]/ Boisvert and the other staff members were also concerned about her lack of communication about any issues which arose on the unit. To them, her secretiveness put them and the patients in danger. Boisvert also believed that Fairbrother was not to be trusted and that she refused to take responsibility for her actions. The others who testified all agreed with this analysis. Fairbrother vehemently responded that, although she did not trust her co-workers, there was no basis for them to mistrust her.

One of the grounds for Fairbrother's sexual harassment

---

[3]/ On another occasion, in May, 2000, Fairbrother reported that she had encountered four patients in the courtyard, where they had permission to be. She came inside and reported that the most volatile of the patients had called her a "bitch" and that he needed to immediately be restricted to the unit. Brown, Jursch, and another FTS went directly to the courtyard to speak with this individual. With great difficulty, they finally were able to bring the patient inside and isolate him from the others, in order to hear his side of the story. Each of the three remaining patients was also segregated in order each might tell exactly what had happened. The accused individual strongly disputed Fairbrother's claim, contending that she had been picking on him "right along", and that he had not spoken to her. Each isolated patient verified the original patient's story, that he had not spoken to Fairbrother. The patient, who had a history of physically abusive behavior, became highly agitated. It became so serious that a silent code was called. A silent code is when all resources, including staff on all six units, and security are summoned to assist in a very dangerous situation. It was the consensus that Fairbrother had fabricated the story. Jursch, Vol. 3 12:13-25; 13:1-25; 14:1-17. Ouimette reported yet another instance of escalation. Ouimette, Vol. 2 103:2-21. In rebuttal, Fairbrother, yet again, asserted that they "were both lying."

complaint was that Whiting was "permeated" with pornography and other sexually explicit items.  However, she knew that, unless disallowed by their doctors, the patients at Whiting were allowed to have magazines such as Playboy, Penthouse, and Hustler in their rooms. They were not allowed to bring them out of their rooms at any time.  If they did, or if a doctor changed his or her order, the magazines would be confiscated by the staff. Generally, if material was confiscated, it would have to be brought to the patient's treatment team for review.  Until the treatment team could hold its meeting regarding a confiscation, the material was put in a sealed and labeled envelope, box, or any acceptable container.  Quite naturally, as the material was being transferred from the patient to the treatment team, the materials could be found in the staff area until boxed. Therefore, even as part of the job, it could be necessary to come into contact with these materials in the staff area.  This was the acceptable, normal policy at Whiting and was not a violation of the sexual harassment policy, according to the Director of Human Resources, Pamela Morrison-Wolf ("Morrison").

Lieutenant Steven Caron, ("Caron"), of the Whiting Police Department, advised that the mail was carefully screened and inspected.  If any member of the staff found pornographic materials left in the staff areas or bathrooms, he or she should report it to the police, who will investigate and, if found, confiscate the material.  The police at Whiting perform monthly "environmental" checks, where Caron, a nurse, and an inspection

control person, Larry Wassell, are walked around by a member of
the unit.  These individuals, along with staff members and
members of housekeeping, go through every room on the unit,
including all staff areas. TT Caron, Vol. 2, 117:18-25; 118:1-4.
If they ever found pornographic materials in the staff area, "We
would not tolerate that.  We would make a report on it." *Id.*
118:5-9.  At no time, beginning in 1999, has he ever found
pornography on any unit. *Id.* 118:14-16.  He has never seen open
sexually explicit material in any staff area or staff bathroom;
pornographic literature on bulletin boards; or obscene drawings
or vulgarities concerning women in any staff area or on any wall.
*Id.* 118:23-25; 119: 1-16.

On February 13, 2000, a code was called on Unit Six.  Young
and FTS Ian Walker ("Walker") were part of the team which
responded.  When they returned to Unit One, they were sitting in
the back room with Tammi Brown, discussing the incident.
Fairbrother was in the room, listening to the conversation.
According to Young, Walker and Brown, Fairbrother suddenly
stood up, said something to the effect of "here's what I'd do",
and reached over and grabbed Walker's genitals.  She then left
the room laughing.  After reflecting on the "Incident", Brown
determined that this was a very serious event and that she had to
write Fairbrother up for it and to advise her supervisor, Davis,
of what had occurred. Neither Boisvert nor Walker wanted Brown to
take this action.  Rather, they wanted to "keep it on the unit

8

and work things out," Brown, contrary to their wishes, felt that the Incident was a very significant occurrence. The Whiting Police came to the unit that night and took statements of all involved.

Due to an administrative error, Morrison was not advised of the Incident for almost six weeks. She immediately began a comprehensive investigation. Sexual harassment is such a critical and important issue, it should have been immediately reported to either the Human Resources Department or to the Affirmative Action Office, according to Morrison.

Resultingly, Morrison interviewed everyone involved with the Incident. In a report to the DMHAS Director of Labor Relations, dated April 17, 2000, she wrote as follows:

> Walker, Brown and Young gave separate but identical versions of the Incident;
>
> Following the Incident, Fairbrother walked out of the room laughing;
>
> In her interview in the presence of Whiting Program Director, Margaret Smith, and District 1199 delegate, Shawn Gallagher, Fairbrother's account contained four outright lies:
>
> > 1) Fairbrother told her not to bother interviewing Young, as he was not present for the Incident;
> >
> > 2) Fairbrother said that her hand "may have brushed [Walker's] pants." Brown observed that Fairbother "grabbed a handful." Young concurred. The ultimate expert, Walker, said that Brown's phrasing was accurate.
> >
> > 3) Fairbrother said that her action "amused" Walker. Both

9

> Brown and Young observed that
> Walker turned red and seemed
> embarrassed. Walker said that
> he was "embarrassed and shocked."
>
> 4) Fairbrother maintains that
> she subsequently apologized to
> Walker. "I started to ask Walker
> if she had, but as soon as I
> had spoke[en] (sic) the word
> `apologized' he interrupted me
> with a forceful `Never!'".
>
> Even at the time of the interview,
> Fairbrother did not seem to take
> the issue seriously. "She said
> they were `just fooling around'."
>
> A number of employees are outraged
> at Fairbrother's actions; they
> cite an apparent "double standard"
> favoring a female offender and
> ask what would happen if a male
> employee grabbed a woman's breast ?

Plaintiff's Trial Exhibit 9.

The Office of the Commissioner responsible for DMHAS and

Whiting wanted Fairbrother terminated.  However, if Fairbrother

acknowledged the episode and took responsibility for it, Morrison

had the authority to suspend her, instead. Morrison. Vol 2. 79:1-

25; 80:1.

On April 25, 2000, Fairbrother's attorney wrote to

Morrison, explaining that a union delegate had advised

Fairbrother that a Loudermill hearing had been requested with

respect to the Incident.[4]/  The attorney next wrote that it was

his position that "a Loudermill hearing would be an unwarranted

and a continuation of the sexual harassment that Ms. Fairbrother

---

[4]/ See Loudermill v. Cleveland Bd. Of Educ., 488 U.S. 941 (1988).

has been subjected to. . . . Please be advised that if this issue
is not resolved promptly, we will file a complaint with CHRO and
EEOC over the continued sexual harassment of Ms. Fairbrother."
Morrison had no idea what the attorney was referring to, as
Fairbrother had **never** spoken of sexual harassment to any
individual in the entire DMHAS.

Accordingly, on May 4, 2002, Morrison wrote to Fairbrother,
advising her that a <u>Loudermill</u> predecisional conference would
take place on May 9, 2002, to discuss a charge of Fairbrother's
violation of DMHAS Work Rule #21 (Racial, ethnic, or sexual
harassment of any person is prohibited). She wrote that the
results of Morrison's investigation of the Incident supported
this charge. Morrison advised her that the maximum discipline
under consideration for this violation was up to, and included,
dismissal from state service.

Fairbrother's immediate response at the hearing itself was
that "they're all lying! This is harassment!" Her union
representative attempted to calm the atmosphere by maintaining
that "Ms. Fairbrother said that `she didn't mean "it"
[unexplained] maliciously.'" Denise Ribble, the Director of
Whiting, responded that the gesture or contact was absolutely
inappropriate; that she was extremely concerned that Fairbrother
would even joke about treating a patient in this manner. The
union then asked for a caucus and left the room with Fairbrother.
When they returned, Fairbrother announced that she wanted to
apologize; that she knew it was wrong; that it had been

11

spontaneous; that she never should have done it; that it would not happen again; and, that it was totally inappropriate. Based on this acknowledgment, Morrison advised Fairbrother that, as soon as the matter had been decided, she would advise her of the discipline, if any, to which she would be subject.

Regardless of Fairbrother's position at the <u>Loudermill</u> hearing, she completely retracted it just three days later when she filed her first CHRO complaint. In the complaint, she denied touching Walker's genitals, averring that, when she only motioned toward him, "he looked up and smiled", as did Brown. Continuing, she averred that she had apologized to Walker on the very night of the Incident. According to Fairbrother, during the <u>Loudermill</u> hearing, Morrison had been "very nasty. She asked me if I denied everything and I said `yes'". **It was not until this complaint** that Fairbrother ever spoke of any sexually explicit occurrences on Unit One. In this complaint, Fairbrother avered: "The men constantly tell dirty jokes and make sexual remarks." On one occasion, as she was pouring coffee for everyone, Colavito was alleged to have remarked that she should wear a french maid's outfit when pouring coffee. "The men are constantly talking about having sex with there wives and talking about penis' and penis sizes. There are also Playboy magazines on the Unit." Affidavit of Illegal Discriminatory Practice by Greta Fairbrother, May 12, 2000 at ¶ 30.

On June 22, 2000, Morrison simply advised Fairbrother that, "[g]iven your willingness to accept accountability for your

actions and in light of your sixteen years of state service, the
Hospital has reduced your discipline from dismissal to fifteen
days' suspension without pay. . . We recommend that at the
conclusion of your suspension you receive re-training in
Physical/Psychological Management Training . . . If you are
experiencing personal problems that are negatively affecting your
work, please contact. . . the Director of DMHAS EAP Coordinator
for referral for an appropriate treatment modality."[5]/

The next day, June 23, 2000, Fairbrother called in and
requested an extended leave. In a letter which followed,
Fairbrother wrote that she had waked up on the morning of June 23
and immediately felt a recurrence of a back problem, which
problem had not bothered her for eleven years. She was out of
work for the next nine weeks.

After she returned to work, on September 28, 2000,
Fairbrother's annual evaluation was done by Boisvert and Brown,
and reviewed by a Whiting Program Manager. By DMHAS standards,
it was deemed an unsatisfactory evaluation. Morrison, who had
discussed the review with Boisvert and Brown, testified that she
would have been "very surprised" if the Incident did not result
in a lower evaluation. Morrison, Vol.2 81:6-10. The comments at
the end of the unsatisfactory review explained: that she had
received a 15-day suspension without pay due to the Incident;

---

[5]/ It is obvious from the language of this letter, Morrison had not yet
seen the CHRO report. When she finally did, she began an immediate
investigation into the charges in paragraph thirty and failed to verify any of
them.

13

that she generally failed to demonstrate her ability to follow all policies and procedures; that she failed to recognize change in the unit milieu and report to her immediate supervisor in a timely fashion; that she did not consistently recognize the special needs of the patients; that she did not consistently interact or report to co-workers and immediate supervisor; that she did not consistently report changes in the patients' conditions; and that she made reference to utilizing inappropriate techniques with agitated patients with an inappropriate gesture. (the Incident). Plaintiff's Trial Exhibit 11.    Fairbrother grieved the review, which grievance was denied. The union also refused to take it to arbitration.

On October 10, 2000, Fairbrother filed an Amended Complaint with the CHRO and EEOC.  In her sworn statement, Fairbrother averred that she was amending the Complaint due to the retaliation she had been subjected to as a result of the filing of her first Complaint. She included as events of retaliation: the above-referenced unsatisfactory evaluation; the initial denial of her workers' compensation claim, which claim was based on her eleven-year old injury; and an order that she was to avoid unit one at all times.  For the **first time ever**, she reported that she had found pornographic magazines on Units One, Four, Five, and Six. She averred that the magazines were often left out and opened to a particular page, or that they were lying on, inside or outside, the staff nursing stations or bathrooms.  She identified the pornographic magazines as Playboy, Hustler, Fox,

14

Gallery, and "Hig City." [sic].  She identified  another female

staff member who allegedly had found a pornographic magazine in a

desk drawer in the staff area.[6]/

Upon notice of these claims, the Whiting Police Department

performed an immediate search and found nothing on any unit,

staff nursing stations, or bathrooms.

Prior to the CHRO taking any action on this Amended

Complaint, Fairbrother filed the instant lawsuit on January 30,

2001.

## LEGAL ANALYSIS

### Federal Rule of Civil Procedure 50

Because a judgment as a matter of law ("JMOL") intrudes upon

the rightful province of the jury, it is highly disfavored.  The

Court of Appeals for the Second Circuit has repeatedly emphasized

that, when confronted with such a motion, the Court must

carefully scrutinize the proof with credibility assessments made

and inferences drawn against the moving party.  Luciano v. The

Olsten Corp., 110 F.3d 210, 214-15 (2d Cir. 1997); EEOC v. Ethan

Allen, Inc., 44 F.3d 116, 119 (2d Cir. 1994).

The standard governing a motion for JMOL pursuant to Rule

50, formerly denominated as a motion for directed verdict or a

motion for judgment notwithstanding the verdict, see generally

Piesco v. Koch, 12 F.3d 332, 341 (2d Cir. 1993), is well

---

[6]/ Fairbrother also failed to call this woman, Jenna Drysdale, to
testify at the trial.

established.    Judgment as a matter of law may not properly be
granted under Rule 50 unless the evidence, viewed in the light
most favorable to the nonmoving party, is insufficient to permit
a reasonable juror to find in her favor. Galdieri-Ambrosini v.
National Realty and Development Corp., 136 F.3d 276, 289 (2d Cir.
1998)(granting motion in Title VII retaliation and gender
discrimination case). Accord Kinch v. Dollar Rent-A-Car Systems,
Inc., 2001 WL 682470 at * 2 (2d.Cir. June 18, 2001); Caruolo v.
John Crane, Inc., 226 F.3d 46, 51 (2d Cir. 2000); Stratton v.
Dep't. for the Aging, 132 F.3d 869, 878 (2d Cir. 1997); Sir
Speedy, Inc. v. L&P Graphics, Inc., 957 F.2d 1033, 1039 (2d Cir.
1992).   In deciding such a motion, the court must give deference
to all credibility determinations and reasonable inferences of
the jury, and it may not itself weigh the credibility of
witnesses or consider the weight of the evidence.   Galdieri-
Ambrosini, 136 F.3d at 288.   Thus, judgment as a matter of law
should not be granted unless:

> (1) there is such a complete absence of evidence
> supporting the verdict that the jury's findings
> could only have been the result of sheer surmise
> and conjecture, or
>
> (2) there is such an overwhelming amount of evidence
> in favor of the movant that reasonable and fair
> minded [persons] could not arrive at a verdict
> against [it].

Cruz v. Local Union No. 3, 34 F.3d 1148, 1154 (2d Cir. 1994)

16

*quoting* <u>Bauer v. Raymark Industries, Inc.</u>, 849 F.2d 790, 792 (2d

Cir. 1988)(internal citations omitted).

In summary, then, the burden on the Defendant is

substantial.

### JMOL As To Title VII Retaliation

Within the framework of Rule 50, the Court will consider the

propriety of JMOL in light of the substantive law of Title VII

retaliation.

It is axiomatic that, in order to prove a case of

retaliation under Title VII, a plaintiff must prove, as part of

her *prima facie* case, that she was subjected to an adverse

employment action that was causally related to her protected

activity.  *See* Jury Charge at pp. 13-14 (instructing that

Plaintiff had met her burden as to the first two elements of

Title VII retaliation, leaving the question of adverse employment

action and causation to the jury).

In the present case, Plaintiff filed a CHRO Complaint on May

12, 2000.  After that date, the adverse employment actions that

Fairbrother alleged in support of her retaliation claim consisted

of: her transfer to a different unit within Whiting, the initial

denial of a worker's compensation claim, an unsatisfactory

service rating in September, 2000, and a written warning in

January, 2001.

"A tangible employment action constitutes a significant

change in employment status, such as hiring, firing, failing to

17

promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 761 (1998). In this Circuit, to constitute an adverse employment action in violation of Title VII, a change in working conditions must be "materally adverse." Galabya v. New York City Board of Educ., 202 F.3d 636, 640 (2d Cir. 2000). A materially adverse change "must be more disruptive than a mere inconvenience or an alteration of job responsibilities" and "might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." Id. (internal quotations and citations omitted). See also Wanamaker v. Columbian Rope Co., 108 F.3d 462, 466 (2d Cir. 1997). Accord Jury Charge at p. 14. See also Crady Nat'l Bank Trust Co. Of Ind., 993 F.2d 132, 136 (7th Cir. 1993)(same); Brown v. Brody, 199 F.3d 446, 457 (D.C. Cir. 1999)(temporary assignment insufficient); Flaherty v. Gas Research Institute, 31 F.3d 451, 456 (7th Cir. 1994)(a "bruised ego" is not enough).

Indeed, a survey of the relevant case law shows that the authority requiring a clear showing of adversity in employee transfer decisions is both wide and deep. Brown, 199 F.3d at 456. See, e.g. Banks v. East Baton Rouge Parish School Board, 320 F.3d 570, 576-77)(5th Cir. 2003)(employer's act of not giving

18

employee right of first refusal not adverse employment action); Forkkio v. Powell, 306 F.3d 1127, 1130-31 (D.C. Cir. 2002)(no adverse employment action when transfer caused only alleged "loss of prestige"); Marrerro v.Goya of Puerto Rico., Inc., 304 F.3d 7, 25 (1st Cir. 2002)(not enough that plaintiff felt stigmatized and punished by transfer; more tangible change in duties or working conditions necessary); Hunt v. Rapides Healthcare Sys., 277 F.3d 757, 769 (5th Cir. 2000)(action that "does not affect job duties, compensation, or benefits" not adverse employment action); Sanchez v. Denver Public Schools, 164 F.3d 527, 532 (10th Cir. 1998)(purely lateral transfer fails *prima facie* case); DiLenno v. Goodwill Indus., 162 F.3d 25, 26 (3rd Cir. 1998)(mere idiosyncracies of personal preference not sufficient as adverse employment action); Horn v. County of San Diego, 1997 WL 579145 at * 2 (9th Cir. 1997)(plaintiff's transfer amounted to subjective loss of job satisfaction rather than adverse employee action); Williams v. Bristol-Myers Squibb Co., 85 F.3d 270, 274 (7th Cir. 1996)(if change of job responsibilities are not so significant as to constitute a setback to plaintiff's career, no adverse employment action); Kocsis v. Multi-Care Management, Inc., 97 F.3d 876, 886-7 (6th Cir. 1996)(transfer with same rate of pay and benefits, with no materially modified duties not adverse employment action); Harlston v. McDonnell Douglas Corp., 37 F.3d 379, 382 (8th Cir. 1994)(to be adverse, change in work assignment must cause "materially significant disadvantage").

In the present case, Fairbrother testified that she suffered

19

no loss of income, benefits, or overtime.  Unit Six, to which she was transferred in June, 2001, offered her the same position in terms of rate of pay, stature, benefits, credit toward retirement, and job duties. TT, Fairbrother, Vol 1; pp. 155:24 to 157:12).  The only loss she suffered was emotional.  *Id*. at 157:13-15.

Although she did not testify during the trial as to the issue, Fairbrother asserts in her memorandum of law in opposition to the present Motion, that she was also "punished and put in danger" when the administration put her into a "floating" position from the time she left Unit One until her permanent assignment to Unit Six on June 27, 2001.[7]/ There was no testimony from any deposition or trial witness that a floating position is a dangerous position, especially when one's duties and responsibilities remain the same and one continues, as did Fairbrother, to work overtime on those units.  In any event, "Title VII was designed to address ultimate employment decisions, not to address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions."

---

[7]/ Fairbrother was permanently reassigned due to the facts that " . . . a patient whom you had escalated in the past . . . has made threats against you. In addition, your colleagues in Unit 1 have voiced concerns regarding their safety in light of the unsubstantiated allegations which you have made against them in the past." For this latter reason, she was also barred from the confines of Unit One, which she considered to be an adverse employment action, because she had to walk around the building to get to her other units, which took five minutes, instead of the two it would take should she be able to cut through Unit One. TT, Atty Witt, Vol 1;  79:2-24; 81:6-8.  The Court disagrees. *See* <u>Sanchez v</u>. <u>Denver Public Schools</u>, 164 F.3d 527, 532 (10th Cir. 1998)(increase in commute of thirty minutes not adverse employment action).

20

<u>Dollis v. Rubin</u>, 77 F.3d 777, 781-82 (1995).    Fairbrother was
assigned to float on different units for a reasonable period of
time until she was permanently assigned to Unit Six.    The Court
holds that such a mediate decision is not an adverse employment
action within the strictures of the authority noted above.

The same is true as to her complaints of the initial denial
of her worker's compensation claim and the written warning she
received on Unit Six in January, 2001.    As to her worker's
compensation claim, Plaintiff contends that the initial denial of
her claim was an adverse employment action, done in retaliation
for her CHRO Complaint.    However, Plaintiff's own testimony
establishes a legitimate, non-retaliatory reason for the initial
denial of her claim.    Plaintiff's work-related injury occurred in
1989.    After her initial treatment, she sought no further
treatment for eleven years.    There was no physical, work-related
incident which triggered her back injury to act up in May, 2000,
to cause her to miss nine weeks of work. Rather, Plaintiff
attributed it to "stress."    TT, Fairbrother; Vol. 3; 114: 13-25,
115: 1-15). After further review of her claim, the claim was paid
in full.    Thus, Plaintiff lost nothing; this is not an adverse
employment action.    *Accord* <u>Trigg v. New York Transit Authority et
al.</u>, 2001 LEXIS 10825 at * 30 (July 27, 2001, E.D.N.Y.)(effort to
deny unemployment benefits not adverse employment action); <u>Roman
v. Cornell Univ.</u>, 53 F.Supp.2d 223, 245 (N.D.N.Y. 1999)(same).
The same is true as to her January, 2001 write-up by her
supervisor.    Fairbrother grieved the write-up, which write-up was

overruled and removed from her file.  Again, she suffered no loss.  *See* <u>Bennett v. Watson Wyatt & Co.</u>, 136 F.Supp.236, 247-48 (S.D.N.Y. 2001)(reprimands and threats of disciplinary action not adverse employment actions)(collecting cases).  "Interlocutory or mediate decisions having no immediate effect upon employment . . . were not intended to fall within the direct proscriptions . . . of Title VII."  <u>Page v. Bolger</u>, 645 F.2d 227, 233 (4th Cir. 1981)(en banc); *accord* <u>Dollis</u>, 77 F.3d at 781-82.  The Court is in full agreement with the rationale of these cases and, accordingly, holds that neither event constituted an adverse employment action.

Fairbrother's final assertion of retaliation is her adverse service rating performed in September, 2000, by Boisert and Brown.  The unsatisfactory evaluation was due, in principal part, to Plaintiff's poor judgment in grabbing the genitalia of Ian Walker.  TT, Boisvert, Vol. 2; 83:12-17. *See also* Plaintiff's Trial Exhibit 11 (setting forth five other reasons for unsatisfactory review).

Fairbrother contends that Boisvert and Brown should not have done the review without referring to her earlier reviews and supervisors.  However, Boisvert had been her Lead FTS in excess of one year and Brown her supervisor for nine months.  This is more than enough time to become acquainted with the person being supervised.  In any event, "[n]egative evaluations alone, without any accompanying adverse consequences, are not adverse employment

actions." <u>Pellei v. International PlannedParenthood Federation</u>,
1999 U.S. Dist. LEXIS 15338 at * 34  ( S.D.N.Y., September 30,
1999). *See also* <u>Valentine v. Standard & Poor's</u>, 50 F.Supp.2d
262, 283-84 (S.D.N.Y. 1999)(negative evaluations alone, without
accompanying adverse result not cognizable)(collecting cases);
<u>Gallo v. Herman</u>, 1999 WL 249709 at * ( S.D.N.Y., April 28,
1999)(lower than previous rating caused no material impact on job
and conditions of employment; no adverse employment action);
<u>Castro v. New York City Bd. Of Educ. Personnel</u>, 1998 WL 108004 at
* 7 (March 12, 1998, S.D.N.Y.(negative evaluations "unattended by
a demotion, diminution in wages, or other tangible loss do not
materially alter employment conditions").

 Here, Fairbrother failed to demonstrate that the one
negative service rating caused a materially adverse change in her
working conditions.  It is beyond cavil that no such evidence
exists, as there was no materially adverse change whatsoever.

 In light of the overwhelming legal precedents and the
equally overwhelming lack of evidence to support the finding of
an adverse employment action in this case, the Court holds that
no reasonable or fair minded persons could have arrived at the
verdict returned in this case.  Plaintiff's evidence, viewed in
the light most favorable to her, is completely insufficient to
permit a reasonable juror to find that she was retaliated against
within the strictures of Title VII.  Resultingly, Defendant's
Motion for JMOL as to the *prima facie* case of retaliation under
Title VII is hereby GRANTED.

### JMOL: Sexual Harassment; Hostile Work Environment

Disparate treatment prohibited by Title VII also encompasses sexual harassment that leads to "a hostile or abusive work environment." <u>Meritor Savings Bank FSB v. Vinson</u>, 477 U.S. 57, 66 (1986); *see also* <u>EEOC Guidelines on Sexual Harassment</u>, 29 C.F.R. § 1604.11 (2000)(sexual harassment includes "conduct [that] has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment"). In order to prove a claim of hostile-work-environment sexual harassment, a plaintiff must establish two elements. <u>Fitzgerald v. Henderson</u>, 251 F.3d 345, 346 (2d Cir. 2001)

First, she must prove that the harassment was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." <u>Harris v. Forkline Systems, Inc.</u>, 510 U.S. 17, 21 (citation and internal quotation marks omitted). *See also*, <u>Perry v. Ethan Allen, Inc.</u>, 115 F.3d 143, 149; <u>Cosgrove v. Sears, Roebuck & Co.</u>, 9 F.3d 1033, 1041 (2d Cir. 1993). Title VII does not authorize a hostile work environment claim for conduct that was merely offensive, rather than sufficiently "severe or pervasive" that a reasonable person would find the environment hostile or abusive. *See, e.g.*, <u>Harris</u>, 510 U.S. at 21; <u>Meritor Savings</u>, 477 U.S. at 67 ("[N]ot all workplace conduct that may be described as `harassment' affects a `term, condition, or privilege' of employment within

24

the meaning of Title VII.").

> [W]hether an environment is "hostile" or
> "abusive" can be determined only by looking at
> all the circumstances.  These may include
> frequency of the discriminatory conduct;
> its severity; whether it is physically
> threatening or humiliating, or a mere
> offensive utterance; and whether it
> unreasonably interferes with an employee's
> work performance.

Harris, 510 U.S. at 23.

These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a "general civility code."  "Properly applied, they will filter out complaints attacking the `ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing,' We have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment. . . ."  Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)(citations omitted).

Second, the plaintiff must show a specific basis for imputing the hostile work environment to the employer.  See, e.g., Perry, 115 F.3d at 149; Karibian v. Columbia Univ., 14 F.3d 773, 779 (2d Cir.), cert. den'd, 512 U.S. 1213 (1994); Kotcher v. Rosa & Sullivan Appliance Center, 957 F.2d 59, 62 (2d Cir. 1992). Although limited defenses may be available, an employer is presumed to be responsible when the perpetrator of the harassment was the victim's supervisor.  See, e.g, Burlington Industries v. Ellerth, 524 U.S. 742, 765 (1998); Faragher, 524 U.S. at 807.