However, if the supervisor's harassment did not culminate in a "tangible employment action", Burlington, 524 U.S. 765; see Caridad v. Metro-Railroad Commuter RR., 191 F.3d 283, 294 (2d Cir. 1999)(constructive discharge not considered "tangible" employment action for these purposes), an employer may avoid liability if (a) it "exercised reasonable care to prevent and promptly correct any sexually harassing behavior, and (b) . . . the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Burlington Indus., 524 at 765; Quinn v. Green Tree Credit Corp., 159 F.3d 759, 767 (2d Cir. 1998). Those circumstances constitute an affirmative defense on which the employer has the burden of proof. Burlington Indus., 524 U.S. at 765.

On the other hand, when the alleged harassment is attributed to co-employees, the "employer will generally not be liable unless the employer either provided no reasonable avenue of complaint or knew of the harassment, but did nothing about it." Tomka v. Seiler Corp., 66 F.3d 1295, 1305 (2d Cir. 1995).

### i. The Trial Testimony

Fairbrother testified that, when she first was assigned to Unit 1, she had no problems working with any of the staff members. TT Fairbrother, Vol 1, 33:12-14. Things started going badly for her approximately one year later. *Id.* 33:15-20. However, things grew increasingly worse in late 1999, as the

hostility increased against her. *Id.* 34:17-23. Examples of alleged conduct making her uncomfortable were "foul language and pornographic literature in the staff areas and staff bathrooms." *Id*, 39:22-24.[8]/ She testified on direct that the pornographic literature was personal to the staff, that they brought the literature to work with them. She acknowledged on cross-examination, however, that she had never seen anyone do this. *Id.* 125:3-7; 21-23. Although she claimed that "generally, the staff carried pornography around with them", she could not identify any such staff member. *Id.* 125: 10-17. Fairbrother finally agreed that she "did not know any of this for a fact." *Id.* 126:13-14.

Fairbrother alleged that she would make and bring coffee to the entire staff and, that, on one occasion, one male staff member **may** have made a remark that she should wear a french maid outfit if she was going to bring them coffee. Id. 42:13-14; 21-23. FTS Jursch refuted her allegations, "just the opposite", asserting that, after she would make coffee for herself and her best friend, Phelps, she would pour the rest of the coffee out. Accord, TT, Ouimette, Vol.2 98:18-21. Further, Jursch testified that the possible "french maid" charge was not true. Jursch, Vol.3 15:16-18

---

[8]/ As noted above, although she referred to offensive language in her initial CHRO Complaint, filed in May, 2000, any references to pornography were not alleged until she filed her amended complaint in October, 2000.

27

As to the Incident, Fairbrother testified that she did not touch Walker's genitals. Fairbrother, 49:17-18. She may have "brushed his pants." *Id.* 49:15-16. According to Fairbrother, Walker looked up at her and smiled, and may have been "a little bit embarrassed." *Id.* 49:19-22. When Brown advised Fairbrother that she was going to have to report the Incident, Fairbrother allegedly responded that "it was just a joke". *Id.* 52:1. Fairbrother next testified that Brown also thought it was a joke but that it could be misconstrued. Fairbrother alleged that the only reason that Brown told her that she had for writing the Incident up was that Brown was still on probation. *Id.* 52:2-5. Brown denied this conversation completely. Defense Exhibit W, Statement of Tammi Brown, taken June 25, 2001, 8:16-23. On rebuttal, Fairbrother took no issue with Brown's denial.

Fairbrother next testified that Morrison should have never investigated what was merely a joke and where she "never grabbed [Walker's] crotch. It should have never been blown up into what is was." *Id.* 175:23-24; 176:3-4. She refused to agree with defense counsel that someone in Human Resources should look into such a charge to see if there is any basis for it, claiming "[n]o, it never should have gotten out of hand the way it did." *Id.* 176:11-15. There should not have been an investigation because Brown, Young, and Walker "set me up, is what they did." *Id.* 177:2-3.

At trial, Fairbrother continued to claim that Young was not

28

present for the Incident. If Young testified to the contrary, and swore under oath that he was indeed present and saw Fairbrother "grab Walker's genitals," then he would be lying. *Id.* 135:3-8. Brown was also lying if she were to confirm the Incident. *Id.* 134:23-25; 135:1-2

If Walker testifies under oath that Fairbrother grabbed his genitals, then, he, too, is lying. Even though she acknowledges that Walker is in the best position to know what happened, he is still lying. Fairbrother, 135:9-13. Indeed, all witnesses who testified about her in any negative manner were "all lying." *Id.* 136:4-5. In fact, Boisvert, Young, Colovito, and Ouimette, were all involved in a conspiracy against her. *Id.* 175:15-18.

When Brown, Young, and Walker all gave statements to Morrison that Fairbrother had grabbed Walker's genitals, they did so "to set her up." *Id.* 176:24-25.

As to the Incident, Walker testified as follows: On the evening of February 13, 2000, Brown, Young, Fairbrother, and he were discussing a code on another unit. Fairbrother began to describe how she would handle it and, in the process, "stood up and grabbed my crotch and left the room." *Id.* 36:10-17 She definitely "grabbed [his] testicles", not merely brushing his pants. *Id.* 36:18-22. He was embarrassed by the Incident. *Id.* 36:25-37:1. Later that evening he was called to the supervisor's office to describe what had happened to him. Regardless of the atrocity of the conduct, he did not want it

29

reported, but hoped to settle it within the unit. *Id.* 37:16-19. Walker further testified that, to the date of his trial testimony, Fairbrother had never apologized to him, regardless of her contention that she did. *Id.* 42:12-13

Young testified that he was most certainly present during the Incident, regardless of Fairbrother's claim to the contrary, and that he could see clearly. Young, Vol. 3, 49:17-19; 24-25. He testified that, in saying "this is what I would do", "her hand came across and hit him in the crotch, plain as day." *Id.* 49:24-25; 50:1-6.

Finally, Brown confirmed the Incident. She described it as follows: She was in the rear staff room with Young and Walker, who had just returned from a code on another unit. "Greta came into the back room and was sort of listening to what we were saying. All of a sudden [she] just grabbed Ian's crotch and said `[i]f I were there, this is what I would have done.'" Walker appeared to be very embarrassed. There was no question in Brown's mind that Fairbrother actually grabbed Walker's crotch. Statement of Tammi Brown, Exhibit V, 6:8-25; 7-12.

Fairbrother finally testified as to an occurrence which allegedly happened several days after the Incident. She was out in the courtyard, doing her daily, recreational, laps. It had just snowed. Another (unidentified) FTS came out with a ruler to measure the snow. Brown and Colavito were in the staff area, and Colavito was alleged to have hollered: "I hope it's as much or as

30

long as your dick". Fairbrother, Vol. 1, 58:7-14. Although the unidentified FTS allegedly replied, Fairbrother could not recall what he had said. *Id.* 59:1-2. Fairbrother testified that she returned to the staff office in order to confront Brown. "I said to Tammi, `Tammi, I find it very distasteful in lieu of what happened just yesterday (the Incident) that you're laughing and joking about things of this nature.'" Id. 59:12-15. She did not specifically mention what Colavito had allegedly just done, only that she was offended by "foul language on the unit." Although Brown advised her that she could not compare the Incident with foul language, they would have a meeting with a nurse supervisor, in order that Fairbrother might state her concerns.[9]

The next day, Brown, Fairbrother, Burgess, and nurse supervisor, Angela Kerin, met. At this meeting, Fairbrother never mentioned the alleged Colavito remark and stated that she was not offended by any language on the unit. Deposition of Tammi Brown, Defense Exhibit V., 29:13-31:15-23. She did say, without specifics, that she had concerns about the way others on the unit were treating her. This, too, inspired the staff meetings. *Id.* 31:23-25; 32:1-4. When asked whether Colavito had made the sexual comment attributed to him by Fairbrother, Brown

---

[9] Brown testified that, after she wrote Fairbrother up for the Incident, Fairbrother began to threaten her emotionally and, in the end, physically. Fairbrother told Brown that "I guess we'll have to just start a tit-for-tat war." Brown 56:1-6. Next, if Brown and Fairbrother were walking down a hallway, Fairbrother would veer into Brown's path in order to "bump" her. Had Brown not moved each time, she would have been physically pushed by Fairbrother. It finally had happened so often, that Brown reported it to the Whiting Police. Id. 56:17-25

31

emphatically responded, "[d]efinitely not." *Id.* 29:21-25; 30:1. On rebuttal, Fairbrother never challenged Brown's denial of the alleged Colavito occurrence. [10]/

Fairbrother further testified that all of her male co-workers began to call her a "bitch" on a daily basis. and, on five or ten occasions, "a whore". These same male co-workers were alleged to talk every day about their sex lives with their wives and invited her into these conversations by asking her "how [she] did it." *Id.* 46:25-47:2. This happened just about every day. *Id.* It included all male co-workers with the exception of "my friends, Dave Phelps and Rich LaBella." *Id:* 174:23-25; 175:1-14.

Every male co-worker who testified was vehement in his denial of any of the misconduct allegedly attributed to him. Boisvert testified that he had never called Fairbrother a "bitch" or a "whore. Bosivert, Vol. 2, 71:15-19. He never heard any other staff member call her these names; "I wouldn't allow it. . . "I would have stopped it right then and there." *Id.* 71:20-25. Boisvert went on the testify that he had never seen any staff member looking through sexually explicit literature, let alone

---

[10]/ On rebuttal, Fairbrother did not challenge the substantive testimony of any defense witness. Her only claim with regard to any of the testimony was that Ouimette and Jursch were still lying. Her only further substantive testimony was when she stated that: she had no memory of the dual escalation of the pass/telephone patient; and, she had not given Phelps a forty-five minute massage. Fairbrother Rebuttal, Vol. 3: pp. 128-136.

32

intentionally "leaving them open for Greta Fairbrother to see." *Id.* 72:18-21. As with all other staff and administrators who testified **in identical fashion**, Boisvert stated with certainty that Fairbrother had never: objected to alleged pornographic material in the staff areas; complained about a hostile work environment; claimed that she was being subject to sexual harassment; claimed someone told her to wear a "french maid" costume; advised him that there were inappropriate notes on the bulletin board; advised him that she did not like the way her male co-workers treated her, were excluding her, or sexually harassing her; or, finally, that pornography was permeating Whiting. *Id.* 73:2-15; 76:4-12; 77:1-3. To his knowledge, Fairbrother never complained to anyone at DMHAS that she was the subject of sexual harassment. *Id.* 73:18-20. None of the many women with whom he had ever worked on Unit One ever had complained of pornography on Unit One. *Id.* 79:25-80:1-10. At no time did any member of the Whiting police, making their routine environmental checks, advise Boisvert that pornography was inappropriately in the staff area. *Id.* 81:20-25.

Boisvert also testified that Fairbrother was giving "provocative" massages to Phelps in the main nurses station, which is all windows. The residents, clients walking by, anybody was in clear view of them. "I was very disgusted and disappointed in their behavior." He told Phelps the next day that such behavior had to immediately stop. Fairbrother, who went

33

on vacation that day, apologized to Boisvert upon her return. Nevertheless, the massages continued. *Id.* 70:2-23; 76:21-25. After the Incident, Fairbrother's treatment of Boisvert, the staff, and the patients worsened. "There was more escalation of patients." *Id.* 78:16-21.

Jursch stated that he had never called Fairbrother a "bitch" or "whore", nor had he ever heard any of his male co-workers use this language toward her. Jursch, Vol 3, 15:15-18. On rare occasions, the men would use profanity or tell an off-colored joke, but it was never in the presence of Fairbrother. "It's a very human environment." *Id*, 30:10-17. He denied any discussion of his sex life with his co-workers. In fact, according to Jursch, the only male staff member who ever discussed his sex life with his wife was Fairbrother's best friend, Phelps. *Id.* 19:15-21. *Accord* Ouimette, Vol. 3, 50:5-8. Jursch, too, was also very concerned about the provocative massages Fairbrother gave Phelps in the staff areas, where patients could see them. The specific one he remembered "clearly" was a forty-five minute massage, covering the entirety of Phelps' upper torso. He reported his concerns to Boisvert because there was "a lot of touching [between Fairbrother and Phelps] that was not platonic. That kind of touching at work is totally inappropriate, especially in a maximum security setting." Jursch, Vol. 3, 16:18-25: 17:1-2; 18:1-5. Jursch also testified that Fairbrother never told him that she was being sexually harassed or that the alleged

34

sexually explicit magazines on Unit One were harassing to her. *Id.* 18:6-9. He never saw pornographic materials left open in the staff area, let alone opened specifically for Fairbrother. *Id.* 19:1-3. Jursch testified further that he had never seen any sexually explicit materials of any kind on the bulletin boards on Unit One. *Id.* 21:15-22. *Accord* Burgess, 62:6-8; Walker, 39:11-13.

Walker never called Fairbrother a "bitch" or "whore", nor did he ever hear Boisvert doing so. Boisvert was always a professional in all of his dealings with staff and patients. Walker, Vol. 3, 39:3-10. Walker never saw any pornographic materials left open on Unit One, nor did he ever see sexually explicit materials on any of the Unit's bulletin boards. *Id.* 39:11-16. Finally, Walker "would never" speak about his sex life with his wife, nor was he ever present when any male staff member on Unit One allegedly did so. *Id.* 40:13-18.

Young "doesn't even talk about his sex life with his friends," let alone co-workers. He never called Fairbrother a "bitch" or "whore" and never heard anyone else do so. Also, he never observed any male staff member making any kind of sexual comments to Fairbrother. Young, Vol 3, 47: 6-19. Young testified that he never carried "anything" to work, especially pornographic literature. He never saw anyone else do so. Fairbrother never complained to him that she knew the male staff members were bringing in such literature, either. *Id.* 47:24-25; 48:1-8. Further, Fairbrother never told him that she was

35

offended by his conduct on the unit, and he never heard her confront any other co-worker with such a contention. She never told him that she was offended by pornographic literature or that she was being sexually harassed. *Id.* 50:25-51:1-4. Young testified that, on occasion, the staff would swear at nothing in particular. "It's like stubbing your toe, you swear." *Id.* 53:4-10. Young denied that Boisvert ever asked him to "get Greta" or "to set her up." Boisvert, was at all times, a complete professional. *Id.* 51:23-25. *Accord* Brown, Exhibit V, 8:24-25, 9:1-2; Walker, 51:23-25, 52:1-14

Other witnesses, mostly female staff members, confirmed what the male staff members testified to. Carol Burgess ("Burgess"), a union representative involved with the Incident investigation, never found open sexually explicit magazines anywhere on Unit One, nor did she ever see anything sexually offensive on the Unit bulletin boards. Burgess, Vol. 3, 61:11-20; 62:6-8. If anyone finds such materials, they are to report it to a supervisor or the Whiting police and it would "absolutely" be immediately removed. *Id.* 62:12-24. The only time Burgess saw sexually explicit materials in the staff area of any unit was when the magazines had been confiscated and then brought to the attention of the treatment team. *Id.* 68:25 - 69:1-2.

Burgess sat in on a meeting on February 14, 2000 with Davis and Fairbrother, in her role as union representative. *Id.* 58:23-25. The purpose was to discuss the Incident, which Fairbrother

36

denied, stating that she did not believe that she had touched Walker. Fairbrother was given an oral counseling and advised that further discipline was possible. *Id.* 59:8-10, 18-22; 60:7-10 Later that evening, Fairbrother told Burgess that she would reenact the Incident for her. As she did, Burgess testified that Fairbrother "actually touched" her. *Id.* 60:12-25; 61:1-2.

Morrison explained that sexual harassment was so critical a claim, that, if reported, it would immediately be investigated by Human Resources or the Affirmative Action Office. Morrison, Vol.2, 20:8-11. Fairbrother never reported her claim to either office. *Id.* 30:1-13, Fairbrother was removed from Unit One because, in her May, 2000 CHRO Complaint, "she had [made] allegations that she was the target of sexual harassment and it was for both her protection - - if the allegations were true, we didn't want her working in an environment where she was continually subjected to those circumstances. If it was not corroborated, we didn't want any more unsubstantiated allegations against her co-workers." *Id.* 21:21-25; 22:1-6. After Fairbrother had filed her initial CHRO Complaint, Morrison interviewed all staff members on Unit One with regard to Fairbrother's specific allegations in paragraph thirty of the complaint, but could not corroborate any of them. *Id.* 23:22-25; 24-1-3, 6-14. Fairbrother was restricted from walking through Unit One because "she was alleging that the men on One were speaking rudely and offensive[ly] to her. If there was any chance these allegations

were correct, we didn't want her subjected to that. On the other hand, if [she was] not speaking the truth, we didn't want the opportunity for her to be there to say they were still doing it." *Id.* 26:1-12. During Morrison's investigation of the Incident, Fairbrother called her continuously, ignoring Morrison's directive not to do so, and claimed "over and over again that they're all liars. It's a conspiracy." *Id.* 30:1-9. Fairbrother never complained to Morrison that she was being called a "whore" or a "bitch", nor did she ever advise Morrison of the pornographic materials permeating Whiting and ask her to investigate. *Id.* 30:1-9. As soon as Morrison learned that the CHRO Complaint had been amended in October to give specifics of all of Fairbrother's pornography contentions, Morrison called the Director of Whiting in order to advise him that he immediately needed a police officer at Whiting to investigate. Sergeant Aubin was dispatched to Whiting on the same day and examined each and every area which Fairbrother claimed was permeated with pornography.[11]/ Morrison, herself, testified that, during her entire tenure at Whiting, she had never seen any pornographic materials left lying open in staff areas, let alone an institute "permeated with pornography." Morrison was "constantly at Whiting." *Id.* 36:25; 37:3-11.

---

[11]/ Aubin reported, in a formal report dated November 11, 2003, that he had found absolutely no evidence to support Fairbrother's claim. During his investigation, he interviewed many female staff members, each of whom denied the claim, save one instance of a magazine found in the bathroom on Unit Five. Aubin returned to the bathroom on Unit Five and found nothing.

38

An FTS on a different unit, Jo-anne Libera ("Libera"), was having difficulties of an unspecified nature with her co-workers on a different unit. Fairbrother advised Libera that, if she would help her with her lawsuit, she would help Libera. Deposition of Jo-Anne Libera, October 10, 2001, read at trial, 10:5-8. Consequently, Fairbrother began calling her and reporting things that were allegedly being said behind Libera's back. However, Libera never knew whether Fairbrother was telling the truth because she was never able to confirm Fairbrother's reports. *Id.* 10:12-13; 11:14-17, 11:18-20. Libera emphatically denied that Whiting was permeated with pornography, stating that, in her twenty years at Whiting, she had found a sexually explicit magazine in a staff bathroom on **one** occasion. Libera reported it to her union representative, it was removed immediately, and she never had another problem. *Id.* 19:10-19; 23:16-17. Prior to Fairbrother filing the present lawsuit, she had never complained to Libera that she was being sexually harassed. *Id.* 23:6-9,

Brown confirmed that no other complaints were ever made to her that Whiting was a hostile work environment for women. This included her assignments on the various units at Whiting and overtime on all units. Deposition of Tammi Brown, January 22, 2003, read at trial, 38:11-15, 21-25. Fairbrother herself never made such a claim to Brown, nor did she ever advise Brown that she was being sexually harassed, that Unit One was permeated with pornography left in staff areas, or that all the male staff

39

members discussed their sex lives in front of her. *Id.* 32:11-13; 33:14-17. Brown testified that she never saw open, sexually explicit materials on Unit One, although she had seen it on "rare" occasions on some of the other units. *Id.* 39:23-25; 40:1-7.

As noted above, Fairbrother testified that she approached her supervisor, Al Davis, in order to request that he set up staff meetings to try and straighten the unit out. Davis agreed to do so. Although she testified that her purpose for wanting these meetings was to end the foul language and pornography, Davis denied such testimony, stating that, at no time did she ever complain to him about pornography on the unit, the sexually offensive conduct of her male co-workers, or any sexual harassment. Deposition of Allen Davis, March 7, 2003, read at trial: 26:24-27. She never brought any similar allegations up at the eight or nine meetings held after the Incident. *Id.* 27:1-21. *Accord* Fairbrother; Vol.1, 66:9-14; Brown, 32:20-25; 33:1-10; Jursch, Vol.3 20:21-24.

According to Fairbrother, the unit meetings set up after the Incident were "a circus. Everyone ganged up on me. They made all sorts of baseless accusations. Everyone called me a `liar.'" Staff members said she was dishonest and "accused me of inciting patients." *Id.* 64:1-7.

Every witness described the necessity of trust among staff members, as it was critical for their own safety and that of

40

others. Fairbrother claimed that she did not trust the staff on Unit One, and, had DMHAS investigated the situation in a proper manner, she would have remained on Unit One, with all the other staff members transferred out. *Id.* 132:12-13; 132:21-22. When, in the meetings held after the Incident, she was advised that her co-workers did not trust her, either, Fairbrother maintained that "they had no basis" for such a charge. *Id.* 133:19-21.

In the end, Fairbrother **never** reported sexual harassment, pervasive pornography on all units, sexually offensive conduct on the part of her male co-workers, or a sexually hostile work environment to **anyone** until after the Incident, when she first alleged some of the behavior in paragraph thirty of her original CHRO Complaint, filed in May, 2000, as amended in October. She never approached the Affirmative Action Office at any time in order to assert sexual harassment, pornography "permeating Whiting", discussions about sex lives, or foul language used against her. Fairbrother, Vol.1, 45:8-15. She never went to anyone in Human Resources. *Id.*, Vol 2, 13:6-8. Finally, she never went to anyone in the administration of DMHAS to report sexual harassment, either. *Id.* 113:4-7.

Had she done so, a written publication would have been issued stating that such behavior would not be tolerated, consistent with the sexual harassment policy of Whiting. Morrison, Vol. 2, 50:21-23. Another thing Morrison would have considered, and which she had done in the past, was to put

41

everyone through sexual harassment training again in order to sensitize the staff. *Id.* 50:23-25. As a result of allegations in the Amended CHRO Complaint, Dr. Cassidy issued a letter to all 500 employees at Whiting that "x-rated" materials should never be posted anywhere within the institute and that anyone with such material was subject to discipline. Fairbrother, Vol. 1 117:10. This was unsatisfactory to her because the letter was not put into the 500 paychecks issued, but were only put in the staff areas of each unit and posted therein. *Id.* 173:21-25; 174:1-6.

Finally, Fairbrother testified that she was familiar with Whiting's sexual harassment policy which outlines exactly how to file a complaint. She was also aware of the general rules of her work place, which also contained the procedure for filing a complaint. *Id.* 156:3-15. She never made use of either.

The Court finds, initially, that Fairbrother has failed to provide any substantive evidence that the terms of her employment were altered, that a "term, condition, or privilege" of her employment was affected, or that anyone "unreasonably interfered with her work performance." *See* Harris, 510 U.S. at 21; Meritor Savings, 477 U.S. at 67; EEOC Guidelines, at 29 C.F.R. § 1604.11. She continues to be employed at Whiting, including overtime at her request. She has admitted that she has lost no compensation or benefits as a result of this action, and its underlying allegations. Finally, in none of her testimony did she claim that her work performance was being unreasonably interfered with

42

by any of her co-workers. In contradistinction, all who testified with regard to her performance on Unit One voiced their concerns about her handling of patients, the many times she escalated those in her care, and the fact that she would take no responsibilities for her actions. [12]/

Nor has she showed any reason for imputing the alleged hostile work environment to DMHAS. DMHAS has a formal sexual harassment policy, which includes the manner in which to process a claim. Fairbrother ignored this process. She **never** reported her allegations of sexual harassment, permeating pornography, being called a "whore" or a "bitch", or a sexually hostile environment to **anyone**, including her supervisors, her co-workers, the Department of Human Resources, the Affirmative Action Office, or anyone in the administration of Whiting or DMHAS. Because she "unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to otherwise avoid harm", Burlington Industries, 524 U.S. at 765, it would be a miscarriage of justice to impute liability to DMHAS. DMHAS **knew nothing** of the alleged actions, sexual harassment, or hostile working environment, all due to Fairbrother's silence. How, then, can DMHAS be held liable ? See Tomka, 66 F.3d at 1305. This Court will not hold DMHAS hostage to Fairbrother's silence.

---

[12]/ In fact, not one of the **500** employees at Whiting came forward to corroborate Fairbrother's claims.

43

This Court finds that Fairbrother's version of the alleged facts is insufficient to permit a reasonable jury to have found that she had been subjected to a sexually hostile work environment. Galdieri-Ambrosini, 136 F.3d at 285. There is such an overwhelming amount of evidence in favor of DMHAS, that reasonable and fair-minded persons could not have arrived at a verdict against it. Cruz, 34 F.3d at 1154. Again, DMHAS has met its significant burden.

## CONCLUSION

For all of the reasons set forth herein, Defendant's Motion for Judgment as a Matter of Law or a New Trial [Doc. No. 59] is hereby GRANTED. JMOL is GRANTED as to Plaintiff's claims of Title VII retaliation and a Title VII sexually hostile work environment. The Clerk is ordered to close this case.

SO ORDERED

_____
ELLEN BREE BURNS
SENIOR UNITED STATES DISTRICT JUDGE

Dated at New Haven, Connecticut, this 29th day of October, 2003.

44