UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| GRETA FAIRBROTHER, | : | CIVIL NO. 3:01CV162 (EBB) |
|     *Plaintiff,* | : | |
| | : | |
| v. | : | |
| | : | |
| STATE OF CONNECTICUT | : | |
| DEPARTMENT OF MENTAL HEALTH | : | |
| AND ADDICTION SERVICES | : | |
|     *Defendant.* | : | August 8, 2005 |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT
OF RENEWED MOTION FOR NEW TRIAL**

**INTRODUCTION**

The defendant moved on or about April 7, 2003 for a Rule 50 Motion for Directed Verdict or, in the alternative, moved for a new trial under Rule 59. The District Court issued its ruling on October 29, 2003, Fairbrother v. Connecticut, 306 F. Supp. 2d 154, (D. Conn. 2003), granting defendant's motion for a directed verdict as a matter of law. The plaintiff filed a timely appeal with the United States Second Circuit Court of Appeals. The Second Circuit affirmed the District Court's ruling on the plaintiff's retaliation claim but reversed that portion of the judgment as a matter of law pertaining to her hostile work environment claim.

Given the court's thorough and detailed opinion outlining the overwhelming evidence refuting the plaintiff's claim, the lack of any corroborative evidence supporting the plaintiff's version of events, and the numerous inconsistencies in her testimony, the defendant renews its motion for a new trial regarding the plaintiff hostile work environment claim.

1

**STANDARD OF REVIEW**

<u>RULE 59</u>

The Court has broad discretion under Rule 59 to set aside a verdict and grant a new trial. Where the jury resolved conflicting versions of events in favor of a party, a new trial is appropriate when one "conflicting account is so inherently implausible as to tax credulity, or there is independent evidence in the trial record" such that a finding for one party, instead of another, would "lead to a miscarriage of justice." <u>Ricciuti v. New York Transit Authority</u>, 70 F. Supp. 2d 300, 308 (S.D.N.Y. 1999). Unlike a motion for judgment as a matter of law, under Rule 59 the court must independently weigh the evidence presented at trial to determine whether the jury's verdict was seriously erroneous or resulted in a miscarriage of justice. <u>Sorlucco v. New York Police Department,</u> 971 F.2d 864, 875 (2d Cir. 1992); <u>Bevevino v. Saydjari</u>, 574 F. 2d 676, 684 (2d Cir. 1978)(the trial court is free to weigh the evidence and need not view it in the light most favorable to the verdict winner).

**THE PLAINTIFF FAILED TO PRODUCE EVIDENCE SUFFICIENT TO PROVE A HOSTILE WORK ENVIRONMENT THAT MATERIALLY ALTERED THE CONDITIONS OF HER EMPLOYMENT.**

The plaintiff's sexual discrimination claim based on a hostile environment is troublesome because the plaintiff was free to describe events with absolutely no corroboration from any witnesses. Her sexually hostile work environment claim includes both sexual comments allegedly made by male co-workers and sex neutral conduct that she failed to establish was done "because of her gender."

To establish a prima facie case of sex discrimination based on a hostile work environment, the plaintiff must essentially prove that: (1) that she was subjected to verbal

2

or physical conduct of a sexual nature; (2) the conduct was severe or pervasive enough to create a hostile work environment; (3) the conduct was directed at her because of her sex; and (4) there is a basis for employer liability. Alfano v. Costello, 294 F.3d 365, 373-375 (2d Cir. 2002).

It is important at the outset to distinguish between the plaintiff's general comments that the environment was "hostile" and true sexual harassment. Sex neutral hostile conduct cannot be used to support a hostile environment claim. Title VII does not protect employees from hostile conduct that is not based on their protected status. In short, the conduct must be sex based and unwelcome. Farpella-Crosby v. Horizon Health Case, 97 F.3d 803. 806 (5th Cir. 1996); Alfano v. Costello, 294 F.3d at 374.

*Hostile Work Environment*

While there is no fixed number of incidents that a person must endure in order to establish a hostile work environment, the court must view the circumstances in totality, examining the nature, severity and frequency of the conduct . Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993). Relevant factors include the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000).

In the present case, the evidence relied on by the plaintiff for a sexually hostile work environment includes:

- one alleged posting on a staff bulletin board entitled " How you talk about a women?"

3

- Fairbrother's uncorroborated self-serving testimony that certain Unit 1 male staff called her a whore "ten to fifteen times" and a bitch almost every day, one of the male employees "may" have told her to wear a French maid outfit, one comment she overheard by FTS Chris Colavito who she claims mentioned the length of his penis, and the male employees talking about their sex lives.

- Unsubstantiated testimony that Unit 1 male staff members brought in sexually explicit materials and left them out for her to see and that pornographic material is everywhere (in all the Units).

To establish a hostile work environment, the plaintiff must show that the work place was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were altered. Leibovitz v. N.Y. City Transit Auth., 252 F.3d 179, 188 (2d Cir. 2001). The test has objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive the environment to be abusive. As a general rule the incidents must be more than episodic, they must be sufficiently continuous and concerted in order to be deemed pervasive. Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997).

Recent circuit case law has upheld the dismissal of cases for insufficient evidence even though compared with the present facts, they involved a greater number of incidents, were compressed into a small period of time, or presented more serious overtones of discriminatory treatment. See Quinn v. Green Tree Credit Corp., 159 F.3d 759, 768 (2d Cir. 1998)( a verbal comment about the plaintiff's buttocks and touching of

4

her breasts); Shepard v. Comptroller of Pub. Accounts, 168 F.3d 871, 872-75 (5th Cir. 1999)(in two year period, co-worker made impertinent and intimate observations about plaintiff's anatomy, attempted to look down her shirt and touched her multiple times); Penry v. Fed. Fed. Home Loan Bank of Topeka, 155 F.3d 1257, 1261-63 (10th Cir. 1998)(in three year period, harasser made comments about her bra strap, her underclothing, whether she had sexual dreams, claimed sexual conquest of another women employee, made pornographic architectural analogies, and took plaintiff to Hooters restaurant on business travel six times); Hocevar v. Purdue Frederick Co., 223 F.3d 721, 735-36, 738 (8th Cir. 2000)(in three year period, several derogatory remarks about women by one or more men, a sexual advance at a company dance, disruption of plaintiff's presentation with a comment about her legs, a remark in a group setting by a company official predicting his sexual conquest of three female employees); Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430-31 (7th Cir. 1995)(in seven month period, nine sexually offensive incidents, including repeated references of the plaintiff as pretty girl and one episode of simulated masturbation).

  In the present case, if the court eliminates the plaintiff's uncorroborated testimony that male staff called her a whore or bitch, she has literally no evidence. She worked in Unit 1 from 1996 until 2000 without a complaint about pornography even though she claims it was there since she arrived. (TT, Fairbrother, pp. 169:19-170:8).

  In contrast, the plaintiff admits that she never filed a formal complaint of any kind until May 2000, after the Ian Walker incident. (TT, Fairbrother, Vol. 2, pp. 4:22-5:1, 6:3:-9; Vol. 1, pp. 169:19-170:1). Nurse Brown and Nurse Supervisor Allen Davis both confirmed that Fairbrother never mentioned sexual harassment to them. (Exs. Y, Depo. of

5

Brown, pp. 32:20-33:21, 38:11-40:19; Ex. AA, Depo of Davis, pp. 26:24-27:21; 28:23-29:16; 38:19-39:12).

Tammi Brown, who was present when Fairbrother claims that FTS Colavito made the remark about his penis, testified that no such remark was ever made. (Ex. Y, Depo. of Brown, pp. 29:13-31:4). Furthermore, in the rebuttal portion of her case, Fairbrother did not deny Brown's testimony that FTS Colavito never made such a comment.

On the issue of whether the plaintiff perceived the environment as sexually hostile or unwelcome, there is her own conduct. In the context of a hostile work environment, among several factors the courts use to evaluate whether sexual conduct was unwelcome, the courts have considered the plaintiff's failure to report harassment and his/her participation in sexual horseplay. Balletti v. Sun-Sentinel Co., 909 F. Supp. 1539, 1548, (S.D. Fla. 1995)(female employee who physically assaulted male co-worker by ripping his pants and the attempting to pull down his pants not victim of sexually hostile work environment); Stoeckel v. Environmental Mgmt. Sys., Inc. 883 F. Supp. 1106, 1114-15 (D.D.C. 1995)(no hostile work environment where plaintiff did not complain to anyone for four months after incidents commenced).

In the present case, Fairbrother testified that she felt comfortable enough in Unit 1 to joke with Ian Walker by grabbing his crotch and giving massages to FTS David Phelps in the work place in front of patients. (TT, Fairbrother 131:23-133:18; 134:8-15). Initially at the staff meeting, Fairbrother denied giving Phelps massages in the work place, but at trial she admitted as much. (Ex. Y, Depo. of Brown, p. 42:19-43:19; TT, Fairbrother 131:23-132:19).

6

Just as a severe single incident can constitute a sexually hostile work environment, the plaintiff's sexual assault of Ian Walker speaks volumes about the veracity of her story. Ian Walker testified that Fairbrother was not his friend, she did not have his permission to "joke" with him, and she definitely grabbed his testicles, leaving no doubt about Fairbrother's conduct. How upset could she have been with the work environment if she felt it appropriate to sexually grab a male co-worker?

Furthermore, there is Fairbrother's comment to Nurse Brown that "I guess we'll just have to start a tit for tat war." (Ex. Y, Depo. of Brown, pp. 55:17-56:7). Such a comment belies any true offense about her work environment and suggests the simple motive for her lawsuit to be retribution against the staff for reporting the Ian Walker incident.

The plaintiff also offered no substantive evidence to refute the testimony of defense witnesses who denied that pornographic materials were everywhere and left out in staff areas. Carol Burgess, Tammi Brown, Lt. Steve Caron, Jo-Anne Libera and the Unit 1 staff all testified consistently that Fairbrother's description is inaccurate. Given the totality of the circumstances, the plaintiff's case for a hostile work environment is insufficient to sustain a verdict.

### THE DEFENDANT IS ENTITLED TO A NEW TRIAL ON THE PLAINTIFF 'S HOSTILE WORK ENVIRONMENT CLAIM BECAUSE THE OVERWHELMING EVIDENCE REFUTES THE PLAINTIFF'S UNCORROBORATED CLAIM.

As stated previously, on a Rule 59 request for a new trial, where the jury resolved conflicting versions of events in favor of a party, a new trial is appropriate when one "conflicting account is so inherently implausible as to tax credulity, or there is independent evidence in the trial record" such that a finding for one party, instead of

another, would "lead to a miscarriage of justice." Ricciuti v. New York Transit Authority, 70 F. Supp. 2d 300, 308 (S.D.N.Y. 1999). **Unlike a motion for judgment as a matter of law, under Rule 59 the court must independently weigh the evidence presented at trial to determine whether the jury's verdict was seriously erroneous or resulted in a miscarriage of justice**. Sorlucco v. New York Police Department, 971 F.2d 864, 875 (2d Cir. 1992); Bevevino v. Saydjari, 574 F.2d 676, 684 (2d Cir. 1978)(the trial court is free to weigh the evidence and need not view it in the light most favorable to the verdict winner).

The defendant submits that a new trial is warranted in the present case because the totality of evidence cannot support the jury's verdict. It was the defendant's contention at trial that the plaintiff allegations of sexual harassment was her attempt for retribution against certain Unit 1 employees who reported her for sexually assaulting Ian Walker. A combination of the plaintiff's own testimony, the lack of any corroboration supporting the plaintiff's story, and the quality and quantity of the defendant's witnesses necessitates a conclusion that the jury's verdict was seriously erroneous.

A careful review of the plaintiff's evidence in support of her claim of a sexually hostile work environment shows that the plaintiff's case consists of :

- one alleged posting on a staff bulletin board entitled " How you talk about a women?"

- Fairbrother's uncorroborated self-serving testimony that certain Unit 1 male staff called her a whore "ten to fifteen times" and a bitch almost every day, one of the male employees "may" have told her to wear a French maid outfit, one comment she overheard by FTS Colavito who she

8

>   claims mentioned the length of his penis, and the male employees talking about their sex lives.

- The unsubstantiated testimony that Unit 1 male staff members brought in sexually explicit materials and left them out for her to see and that pornographic materials is everywhere (in all the Units).

The rest of the plaintiff's complaints that the staff did not trust her, would not include her when they called out for food, would not give her phone messages and two sex neutral items she took from the staff bulletin boards in Unit 2 and 6 are gender neutral (TT, Fairbrother, 32:25-33:8; 170:23-171:2; Exs. 12 and 13)..

The defendant submits that the plaintiff's case must fail because there is not one piece of corroborating evidence to support Fairbrother's testimony that she was sexually harassed by the Unit 1 staff, or anyone else. In Koelsch v. Beltone Electronics Corporation, 46 F.3d 705 (7th Cir. 1995), the plaintiff was terminated. She then filed a suit against the company alleging sexual harassment based on a hostile work environment against the company's president and other employees. In support of her claims, she simply offered her own testimony. Rejecting the plaintiff's claim on summary judgment, the court stated:

>   Koelsch's bare assertions are the only evidence of the causal link between her report of alleged sexual harassment and her termination. In fact, all that Koelsch offers with respect to any of her claims is her own deposition testimony. The record contains **absolutely nothing in the way of corroboration of her claims.** Regarding the causal link, Koelsch could have adduced the evaluation itself, testimony from coworkers, or anything to permit the inference that she was unfairly treated rather than the inference that we have drawn; that Koelsch is merely seeking retribution for her termination.

Id. at 708-709.

The point made by the Court in <u>Koelsch</u> was that the plaintiff's testimony alone was not sufficient to create a triable fact when the evidence suggested that the plaintiff's motivation for her claim was simply retribution. The same logic is equally applicable to the present case. Greta Fairbrother worked in all of Whiting Division's six units. Among the 500 plus employees at Whiting, she did not call a single witness to corroborate any aspect of her story. Even Jo-Anne Libera, who the plaintiff says was experiencing the same thing she was, denied the existence of pornographic materials everywhere. Libera also denied that William Boisvert had ever solicited her help to get rid of Fairbrother. Libera testified to one incident in 18 years when she found a magazine in a drawer in the staff area and reported it. The magazine was promptly removed.

Then there is the testimony of Lead Forensic Treatment Specialist Carol Burgess, who is also a union delegate. She refuted Fairbrother's testimony that pornographic materials were left in the staff areas or posted on bulletin boards. How about the testimony of Lt. Caron of the Whiting police department. He testified that he routinely inspects the units at Whiting and if there is inappropriate material in staff areas, it is removed. More telling is his testimony that less than a week before trial, he inspected all of the staff areas at Whiting and found nothing. Surely Lt. Caron and Carol Burgess are not part of the plaintiff's fantasy of a grand conspiracy to lie.

Then there is the plaintiff's own testimony. First she stated in her deposition that patients are not permitted to have sexually explicit materials. Then she admitted at trial that she was wrong. Mind you that she had been employed at Whiting for four and half years when she testified incorrectly under oath at her deposition about patients possessing sexually explicit materials. (TT, Fairbrother, pp. 110:10-111:24). But at trial after she

admitted that patient materials do get confiscated, she stated that the magazines she allegedly saw staff members looking at did not belong to patients. She has no evidence of this fact except to say that the material was in the staff area. (TT, Fairbrother, pp. 114:3-115:24).

More telling is the plaintiff's testimony that the hostile work environment continues to this day, even though after May 2000, she never worked with William Boisvert or the Unit 1 staff.  When questioned about the fact that she has not worked with the people from Unit 1 that she allegedly had problems with, the plaintiff offered the unfounded conjecture that "No, but they have friends and they tell their friends and the whole building is hostile towards me because I filed the suits against them and DHMAS." (TT, Fairbrother, pp. 153:16-155:19).  Again, the plaintiff simply fabricates speculative facts to suit her purposes.

A synopsis of the evidence further highlights the weakness of the plaintiff's case:

* Fairbrother did not file a formal complaint about a hostile environment until <u>after</u> she realized that she was going to be disciplined for sexually assaulting Ian Walker.

* Every witness, including Union delegate Carol Burgess, Police Lt. Caron, Libera, Pamela Morrison and the Unit 1 staff all confirmed that, except for an occasional magazine confiscated from a patient, pornographic material was not left lying around in the staff areas or posted on the staff bulletin board.

* Allen Davis, now retired, denies that Greta Fairbrother ever complained to him about sexual harassment of any type.

* Nurse Tammi Brown, who did not know Greta Fairbrother before she was assigned as the Head Nurse on Unit 1, denies that pornographic material was left open in the staff area or that the male staff made sexual comments.

* William Boisvert (now retired), Jacque Ouimette, Ronald Jursch (now retired), James Young and Ian Walker (who the plaintiff admits that she had no problems with), all denied making or hearing anyone refer to the plaintiff as a bitch and/or whore. They also denied that male co-workers showed the plaintiff sexually explicit material or talked about their sex lives.

* Fairbrother admits that she felt comfortable enough in Unit 1 with Ian Walker, a person who was not her friend , that she could "joke" with him by grabbing his crotch.

* Fairbrother acknowledges that she felt comfortable enough in Unit 1 to give co-worker David Phelps massages at work to the point that the Lead FTS William Boisvert, had to tell them to stop.

* William Boisvert , Jacques Oiumette and Ronald Jursch and Nurse Brown all testified to specific incidents when Fairbrother escalated patients, which Fairbrother testified that she could not recall.

* Fairbrother did not deny Nurse Brown's statement that Fairbrother told her: "I guess we'll have to just start a tit for tat war."

* Brown felt threatened by Fairbrother and complained that the plaintiff would try to walk into her at work.

12

* Fairbrother first denied, but then admitted that she had been counseled about her conduct in the work place in connection with a complaint filed against her by another employee, Thelma Bishop.

* Fairbrother first denied, but then admitted that she might have touched Ian Walker on February 12, 2000. Ian Walker, Jim Young and Tammi Brown all confirmed that Fairbrother did grab his crotch.

* Fairbrother concedes that her suspension for sexually assaulting Ian Walker, which she calls a "joke," was not retaliation.

* Fairbrother admits that she was wrong when said stated in her deposition that patients could not possess sexually explicit materials.

* Fairbrother has no actual evidence that staff brought sexually explicit materials into the work area. She simply assumes that if she saw one, it belonged to the staff.

* Jo-Anne Libera testified that she reported a single pornographic magazine in a staff bathroom on one occasion in 18 years, and it was promptly removed.

* Fairbrother never delivered to the human resource department, her union delegate, a supervisor or a police officer, materials appearing on the staff bulletin board that she thought were offensive.

* Of the three exhibits showing material allegedly posted on the staff bulletin board in Units 1, 2 and 6, two of the exhibits are sexually neutral (Exhibit 12 and 13). Only Exhibit 14 is sexual in nature.

13

* Lt. Caron testified that in November 2000, Sgt Aubin inspected the Whiting units that the plaintiff identified as having pornographic material, but found nothing.

* Less than a week before trial, Lt. Caron personally inspected all of the staff areas in Whiting and found no pornographic materials.

* Lt. Caron testified that monthly inspections are made of Whiting, and if inappropriate materials are there, they are removed.

* Fairbrother knew about the CVH sexual harassment policy and the procedure for reporting a complaint.

* Fairbrother testified on direct examination that she was never assaulted by a patient at Whiting. But during the plaintiff's case in chief she admitted that as recently at 2002, a patient violently attacked her, grabbing her by the hair and pounding her head into the ground.

* When asked about the meetings she requested with Nurse Supervisor Davis, Fairbrother said she wanted to get rid of the pornography, but made no mention of sexual comments.

Most disturbing about the verdict in this case is the terrible message it sends to Whiting employees that a person, such as the plaintiff, can sexually assault a male employee, file a lawsuit and on her testimony alone make unsubstantiated allegations against male employees. With no corroborating evidence to substantiate her claims that male staff in Unit 1 had made sexual remarks to her, Fairbrother's only response to the numerous witnesses that testified against her was to assert that every witness was "lying"

"They are all lying!" Can it truly be the case that all 11 of the defendant witnesses were lying? (TT, Fairbrother, p. 125:14-15). Not likely!

It is not only the quantity of witnesses who refuted the plaintiff's testimony, but the quality as well. Carol Burgess, a lead FTS, Police Lt. Caron, Allen Davis, Head Nurse Tammi Brown, all refuted aspects of the plaintiff's case. The plaintiff did not call a single witness to corroborate any part of her testimony.

For instance, Plaintiff testified that pornographic material was lying out in the staff areas of every unit. She stated that "it's everywhere." Witnesses such as Carol Burgess, Lt. Caron, Davis, and Libera, all disagreed with that statement. Can it truly be that Lt. Caron, who does not even know the plaintiff, lied when he testified that he had inspected the staff areas of Whiting less than a week before trial and found no pornographic materials. Is Sgt. Aubin's report of November 3, 2000 a fabrication? (Exhibit Q). Even Ian Walker, who does not normally work on Unit 1, agreed that pornographic material is not left out in the staff areas.[1]

The plaintiff also stated that she complained to Davis, the Nurse Supervisor and Boisvert about sexual harassment in Unit 1. Not so according to Boisvert, Davis and Brown. Davis's testimony on this point is straightforward:

> Q: During the meeting, at any time did Ms. Fairbrother ever express while you were there that she was subjected to a hostile work environment because the environment was permeated with sexually explicit materials?
>
> A: No, she did not.
>
> Q: Did she ever complain in meetings that were held subsequent to February 13, 2000, that you attended that she was being sexually harassed?

---

[1] The plaintiff acknowledges that sexually explicit material may be confiscated from patients and retained in the staff area for the Treatment Team to review. (TT, Fairbrother, pp. 110:10-111:20).

A:   No she did not.

Q:   Did she ever indicate during the meetings that you attended that the FTS staff were talking about sexual exploits they were doing with their wives and spouses?

A:   No.

Q:   I understand that she did express concerns that she felt the staff wasn't getting along with her?

A:   Yes.

Q:   At any time did she tell you during these meetings that she felt that Bill Boisvert was threatening her?

A:   No.

Q:   At any time did she ever tell you during these meetings that she felt that Bill Boisvert was soliciting help to get rid of her from the unit?

A:   No.

*   *   *

Q:   Prior to February 13th, 2000, are you aware of any complaint that Greta Fairbrother ever made regarding a sexually harassing environment?

A:   No.

Q:   A hostile work environment?

A:   No.

Q:   Pornography permeating the work area?

A:   No.

Q:   Did she ever come to you and tell you that there were pornographic magazines left open for her to see . . .

A:   No.

Q:   -- that she felt was directed to her?

16

> A:  No.
>
> Q:  Did she ever bring to you to that she took off the bulletin boards in the staff area and told you that "See, this is what I was subjected to"?
>
> A:  No.
>
> Q:  Not at all when you were nurse supervisor?
>
> A:  No, sir.
>
> \*   \*   \*
>
> Q:  Now Mr. Davis, isn't it a fact that in November Greta Fairbrother came to you and requested that you have staff meetings because of what she perceived as hostility on the unit towards her.
>
> A:  November of what year?
>
> Q:  Of '99 before the staff meetings were held.
>
> A:  I don't recall that.
>
> Q:  You said that she discussed with you a couple of times about personality conflicts. When were those discussions?
>
> A:  Probably -- probably in the fall of '99. Fall of '99. Probably. I can't say for sure.
>
> Q:  And what were the nature of the personality conflicts that she told you about?
>
> A:  Generally that the employees on the unit weren't getting along, and she thought that, you know, she could work the problems out on the unit.
>
> Q:  Was she giving you any specifics?
>
> A:  Not that I recall.

(Exhibit AA, Depo of Davis, pp. 26:24-27:21; 28:23-29:16; 38:19-39:12). Tammi Brown concurred. (Ex. Y, Depo of Brown, pp. 32:20-33:21). Contradicting the plaintiff's

17

fabricated testimony that Nurse Brown reported the February 13, 2000 incident at the urging of William Boisvert, (TT, Fairbrother, p. 135:13-24), there is the un-refuted testimony of Nurse Brown, who testified exactly the contrary. After the incident involving Ian Walker on February 13, 2000, Bill Boisvert pressured her NOT to report the incident it to the front office, preferring to handle it on the Unit. She testified:

> Q:  Mr. Boisvert, what did he tell you with respect to your describing the incident to him?
>
> A:  Bill actually requested that I not go out front. That we try and deal with it on the unit. But as I said, I thought it was too serious to not report it to someone.
>
> Q:  Did anyone pressure you to report the incident?
>
> A:  No.
>
> Q:  Did anyone ever pressure you not to report it?
>
> A:  Yes.
>
> Q:  Who was that?
>
> A:  Bill and Ian also did not want me to report it.

(Ex. AA, Depo. of Brown, pp. 24:17-25:4).

It simply doesn't make sense that Boisvert, who actually wanted to handle the Ian Walker incident within the Unit, is now lying about everything according to Fairbrother. Nurse Brown, Nurse Supervisor Davis and Lt Caron all testified to Boisvert's honesty, professionalism and integrity. The plaintiff did not offer the testimony of a single witness that in any way questioned the honesty of William Boisvert's testimony or the truth of the testimony of any other witness. The best that plaintiff's counsel could do was insinuate that Ronald Jursch committed abusive acts

towards patients, conveniently leaving out the fact brought out on redirect examination that no charge against Mr. Jursch was ever substantiated.

In sum, the overwhelming evidence refuting the plaintiff's case and the total lack of corroboration of the plaintiff's testimony necessitates a new trial on the plaintiff's sexual hostile environment claim.  Allowing the verdict to stand would work a manifest injustice.

## CONCLUSION

For all of the above reasons, the defendant renews its request that that the court grant its request for a new trial regarding the plaintiff's hostile work environment claim consistent with the Second Circuit Court of Appeals ruling.

DEFENDANT, DEPARTMENT OF
MENTAL HEALTH AND ADDICTION
SERVICES

RICHARD BLUMENTHAL
ATTORNEY GENERAL

BY:_____
    Joseph A. Jordano
    Assistant Attorney General
    Federal Bar # ct21487
    55 Elm Street, P.O. Box 120
    Hartford, CT 06141-0120
    Tel: 860-808-5340
    Fax: 860-808-5383
    E-mail: Joseph.Jordano@po.state.ct.us

## **CERTIFICATION**

The undersigned hereby certifies that on this       day of August, 2005 a true and accurate copy of the foregoing memorandum was sent by First Class United States mail, first class postage prepaid, to:

Michelle Holmes, Esq.
Law Office of Michelle Holmes
67 Holmes Avenue
Waterbury, CT  06702

_____
Joseph A. Jordano
Assistant Attorney General